UNITED STATES DISTRICT COURT

DISTRICT OF NEW MEXICO

DORREL COULTHRUST,

      Plaintiff,

v.                                    CIV 07-1125 WJ/KBM

BRUCE CAMPBELL and
DONALD LACY,

      Defendants.

# PROPOSED FINDINGS/RECOMMENDED DISPOSITION AND
# ORDER FOR DEFENDANTS' TO CURE DEFICIENCY

Plaintiff Dorrell Coulthrust instituted this § 1983 action for damages when

he was incarcerated at the Cibola County Correctional Center ("CCCC").  He

claims a violation of his Eighth Amendment rights for delay and denial of medical

treatment.  *See, e.g., Doc. 1* at 1-2, 8.  I ordered briefing on a *Martinez* Report,

which is now complete.  *See Docs. 22, 27, 28.*  The case is straight-forward.  It is

also well-briefed by both Plaintiff and Defendants, which the Court appreciates.[1]

---

[1] Despite my express directions to the contrary, none of the documents submitted with
are unauthenticated by the affidavits that were submitted.  *See Doc. 14* at 3 ("*Defendants must
provide affidavits to properly authenticate submitted documents,* and may also submit other
affidavits in support of the *Martinez* Report") (emphasis added); *see also Doc. 22-2* at 2; *Doc. 22-4*
at 2; *Doc. 22-6* at 2.  Nor is there any assertion in the argument accompanying the *Martinez*
Report that the documents are self-authenticating.  *See* FED. R. EVID. 901-902.  I will consider

Having carefully considered the entire record, I recommend that the action be dismissed with prejudice.

## I.  Recharacterization As *Bivens* Action

Plaintiff was a federal prisoner awaiting deportation when the events occurred.  *See, e.g., Coulthrust v. Decker,* CIV 08-151 MV/ACT (Plaintiff's § 2241 dismissed 4/23/08).  As an initial matter, I find that this case should be recharacterized as a *Bivens* action,[2] with jurisdiction pursuant to 28 U.S.C. § 1331 as Plaintiff asserted in his Complaint, because CCCC incarcerated him "pursuant to a contract between Corrections Corporation of America ('CCA'). . . and the United States Marshall's (sic) Service."  *Doc. 22* at 4.[3]  Regardless of whether the action is a *Bivens* or § 1983 action, the Eighth Amendment standards and analysis

---

the omission to be an oversight, discuss the documents for the purposes of this analysis, and order Defendants to cure the defect within the time for objections.  In all other respects, and as noted above, the *Martinez* Report is very well done.

[2]  *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics,* 403 U.S. 388 (1971).

[3]  *See also Doc. 1* at 2 ("The defendant is an employee at a private company under contract to house Federal prisoners – Defendant is a 'Federal actor' . . . Jurisdiction is asserted pursuant to 28 U.S.C. § 1331 for federal actors."); *Sosa v. Alvarez-Machain,* 542 U.S. 692, 742 (2004) (Scalia, J., concurring) ("*Bivens* . . . created a private damages cause of action against federal officials . . . the authority to create this cause of action was derived from our general jurisdiction to decide all cases 'arising under the Constitution . . . 28 U.S.C. § 1331") (internal quotations and citation also omitted); *Menteer v. Applebeem,* 196 Fed. App'x 624, 627-28 (10th Cir. 2006) (federal courts have subject matter jurisdiction over *Bivens* action against individuals who work for CCA).

is the same.  *E.g., Kikumura v. Osagie,* 461 F.3d 1269, 1291 (10th Cir. 2006) (*Bivens*

action outlining Eighth Amendment medical care standards), *abrogated on other*

*grounds by Bell Atl. Corp. v. Twombly,* 550 U.S. 544 (2007); *Mata v. Saiz,* 427 F.3d

745, 751 (10th Cir. 2005) (§ 1983 action outlining Eighth Amendment medical care

standards).

## II.  Factual Background

Plaintiff is an athletic and physically fit person and injured his arm during a

basketball game at CCCC in August 2006.  He believes that he suffered a torn

muscle at the time, but CCCC medical staff disagreed and believed the muscle was

simply pulled.  *See Doc. 1* at 9-10.  Some of the dates in Plaintiff's version of events

are somewhat confusing, so what follows is the general time line according to his

assertions.  *See, e.g., id.* at 22-24 (Plaintiff's affidavit that repeats the factual

allegations of his Complaint in summary form).

Plaintiff's view of the facts is that he did everything he was told to do by

CCCC medical personnel but he remained in constant pain.  For example, he

asserts that just after the accident, he deferred to CCCC medical staff "judgment,

stopped exercising for [six] months . . . and waited for the muscle to heal," but

"after months of pain and returning to sick-call, with no proper medical treatment,

[he] requested a second opinion form an out-side medical specialist." *Id.* at 10 (spelling corrected).   He "finally was able to convince" CCCC medical staff to "schedule [him] for a sonogram test," *id.* (spelling corrected), but this also triggered a series of grievances for Plaintiff, *see id.* at 10-15.  Within a few months of initiating the grievances, Plaintiff was scheduled for an x-ray and for a consultation with an a "Health Care Provider," though what he wanted them to do was send him for an "MRI." *Id.* at 12.[4]  And, although the CCCC medical staff view of the results of the sonogram was that Plaintiff only had "some scar tissue from an old injury," *id.* at 10, they also arranged for him to be taken to Lovelace Hospital in Albuquerque and to be seen by someone who Plaintiff characterizes as a surgeon – "Dr. Reagun," *id.* at 16.  According to Plaintiff, this person performed a "physical test . . . and determined that [he] may have torn a band [but that it was] difficult for him to determine exactly which muscle was torn, because the sonogram/ultrasound test results from CCCC Medical Department were

---

[4] *See also Doc. 1* at 14; *Doc. 1-3* at 7 (document attached to 8/06/07 grievance requesting to see a "specialist or a sports doctor who is familiar with my type of injury [or] at minimum schedule me for an M.R.I."); *id.* at 11 (in response to being scheduled for an x-ray, in document attached to 8/19/07 grievance, Plaintiff asserts that he is "not a medical expert . . . [yet] . . . aware that this type of injury would not show up on a regular x-ray.  A[n] M.R.I. would have been the appropriate method/procedure to determine the extent of damage to the muscle or ligament.").

inadequate." *Id.* Although "Dr. Reagun" recommended an MRI test, CCCC "would not approve the MRI" because "the Bureau of Prisons would not approve the MRI because [the] injury was not life threatening and that surgery would be considered 'elective.'" *Id.*

This suit resulted because Plaintiff believes that CCCC did not provide him "the proper medical treatment" which was "surgery" to repair his torn muscle. *Id.* at 15, *see also id.* at 17. He asserts that CCCC delayed in giving him treatment because it knew his sentence would soon expire and it thus could save money by requiring not providing the surgery:

> because he had only a few months remaining on his federal prison sentence, CCCC medical department/defendant(s) tried to hide from [him] the fact that he had torn a muscle; and because of the defendant(s) refusal to provide [him] with the proper medical treatment in a timely manner, [his] torn muscle healed incorrectly causing a ligament to protrude . . . defendant(s) decided not to give [him] the proper medical treatment (surgery) . . . to save money. Therefore[,] once [he] is released from prison, [he] will have to foot the bill to defray the cost of corrective surgery, in order to repair the torn muscle.

*Id.* at 15.[5]

---

[5] *See also Doc. 1* at 17 ("Plaintiff strongly believes that it is the intentions of CCCC and its medical department to patronize plaintiff with unnecessary medical appointments and paper work, in attempts to stall for time, hoping that plaintiff will be released from CCCC custody before anything significant can be done to fix plaintiff's torn muscle. Once plaintiff is released

The medical records submitted with the *Martinez* Report contradict

Plaintiff's assertions in some respects.  First, they do not bear out his assertion that

he rested for six months after the August 2006 injury or that he was in chronic pain

from the arm injury.  For example, he was treated on August 7, 2006, for the injury

with warm compresses and balm, and instructed to "RTC" or "return to clinic" if he

was not better in forty-eight hours.  *Doc. 22-3* at 2.   There is no indication that he

returned within two days.  Instead, the next record is dated August 23, 2006, where

Plaintiff complained of "muscle strain" from the basketball injury and reported

"pain is slowly improving."  *Id.* at 4 (he was advised to do "ROM" or range of

motion exercises and prescribed "A-balm").  From September 2006 to February

2007, Plaintiff did not complain of arm pain during medical visits.  Instead, he

complained of other ailments or of the back pain he sustained while playing

basketball less than two weeks after his August 23rd visit and thereafter.[6]

---

from this facility, [he] will have to foot the bill to defray the cost of corrective surgery; a medical bill which CCCC should be held responsible for"); *Doc. 1-4* at 4 (attachment to a grievance dated 6/28/07, Plaintiff asserts that it "is obvious that the Medical department knew that I had a legitimate injury that required proper medical treatment but refused to act on my behalf, because the procedure would not be cost effective for the Medical department. . . . therefore I also believe that it was the intention of the medical department to cunningly prolong the process that would have allowed me to know the extent of the injury").

[6] *See Doc. 22-3* at 5-6 (9/8/06 complaints of dermatitis and respiratory problems); *id.* at 7 (9/19/06 complaints of nausea, vomiting, and weakness); *id.* at 8 (10/5/06 complaint of back pain from "playing in basketball"); *id.* at 9 (11/7/06 complaint that he "restrained low back playing basketball"); *id.* at 10 (11/28/06 complaint that his hip and low pack pain was "worse [with]

Plaintiff instituted his first grievance on February 15, 2007, asking to see "an Outside-Specialist or a doctor who is familiar with this kind of sports injury; in case surgery or some kind of therapy is required." *Doc. 22-7* at 3; *see also id.* at 2.[7]  In the grievance disposition five days later, he was told that he "need[ed] to come to sick call to be evaluated." *Doc. 22-7* at 2.  He did not do so.  He let almost seven weeks pass before he requested a medical appointment on April 9, 2007.  *See Doc. 22-3* at 14.  He was promptly seen by Dr. Kimball two days later.  *Id.* at 14-15.

Dr. Kimball's notes reflect that Plaintiff has a history of "injury to the [right] shoulder sustained during a basketball game – hyperextension injury by description." *Id.* at 14.  Plaintiff reported hearing a "pop" – now has [increased] chronic pain & [lessened] [range of motion] & is requesting referral . . . would like diagnostic study performed detailing the nature of his injury." *Id.*  The doctor scheduled a "musculokeletal U[ltra]S[ound]" to rule out a "tendon tear; triceps"

───────────────

rigorous exercise" and was assessed with "joint pain [secondary] to high impact exercise regimen"); *id.* at 11-12 (2/13/07 complaints of upper respiratory problems).  The dates on the medication charts are cut off, but do show that he was prescribed Naproxen, ibuprohen, and "A-Balm" in 2006 and 2007.  It is not clear from them how often he took the medication.  *See Doc. 22-5* at 2-16.

[7]   This the earliest grievance concerning his arm injury in the record, whether submitted by Plaintiff or Defendants.  *See Doc. 1* at 18-24; *Doc. 1-2* at 1-9; *Doc. 1-3* at 1-11; Doc. 1-4 at 1-17; *Doc. 22-7* at 2-12.

and prescribed "ibuprofen as needed."  *Id.*[8]

When Plaintiff filed another grievance on April 17, 2007, again requesting to

see an outside specialist, *Doc. 22-7* at 4-5, the April 19, 2007 response was that he

was already scheduled to have an "ultrasound . . . for week of April 22, 2007," *id.* at

4.  The ultrasound of his triceps muscle and a blood flow study was performed in

Albuquerque on April 26, 2007.  As Dr. Kimball predicted, Dr. Philllip W.

Carmody diagnosed "hyperextension" and explained:

> The triceps and latissimus dorsi appear intact.  At the
> proximal portion of the triceps muscle, there is evidence
> of scarring which appears chronic in nature without
> evidence of increased blood flow.  This represents and
> area of previous trauma.  There is no evidence to suggest
> acute trauma at this time.  No other abnormalities are
> seen.
> IMPRESSION:  Evidence of scarring at the most
> proximal portion of the triceps muscle without evidence
> of increased blood flow consisted with probable previous
> incomplete tear.  Latissimus dorsi is unremarkable.  MRI
> examination may be of value.

*Doc. 22-3* at 15.

Three months passed before Plaintiff was seen again at the CCCC clinic on

July 30, 2007.  *See id.* at 16.  In the interim, however, he had filed another

grievance complaining of "unwanton and unnecessary infliction of pain - in

---

[8]  The rest of the doctor's prescription notes are illegible or cut off.  *Id.*

violation of the eight amendment," *Doc. 22-7 at 6*, because he was

> not satisfied with the sonograph findings nor what was done by [CCCC] Medical department to assist me in getting proper medical treatment for my injury. The sonogram report showed that there was some scar tissue, therefore this tells me two things:
>
> 1. There was damage done to the muscle and
> 2. Had I receive[d] the proper medical treatment when I initially complained about the injury, more could have been done to assure that the muscle healed properly.
>
> It is my belie[f] that the reason why I'm still experiencing pain is my arm and why I'm not able to do certain range of motion tasks and exercise is due to the fact that the muscle has not healed properly or something is wrong with the muscle.
>
> I know my body better than anyone[,] anyone. Just by looking and comparing the same muscle in the right and left arm, even a novi[ce] physician can clearly see that one muscle is augmented and different than the other. Also but simply feeling the muscle one can tell that there are no muscle fiber where there should be.
>
> REQUESTED ACTION
>
> Because of the continuous pain I'm having and not being able to do pull-up exercise or other simple tasks, such as mop[p]ing, without experiencing pain, I am requesting that I be take to an out-side specialist to be evaluated and see what can be done to have this injury corrected. I trusted the medical judgment of CCCC medical staff and all it got me was scar tissue and incorrectly or partially healed muscle. It is the duty of this facility to provide me with the proper medical treatment I need.

*Id.* at 7.  The day before he visited the clinic on July 30, 2007, he filed another

grievance asking to "be provided a medical professional/specialist who can

accurately diagnose and treat my injury."  *Id.* at 8-9.[9]

At the July 30, 2007 visit, Plaintiff complained to a nurse that he was injured

"1 yr ago" playing "basketball" and experienced "excessive pain" during "overhead

use of arms."  *Doc. 22-3* at 16.  He sought a refill of his "Naproxyn," as well as "A-

Balm" and "Biofreeze."  *Id.* at 16.  On August 31, 2007, Plaintiff was complaining of

shoulder pain and requesting further w[or]k-up."  *Id.* at 19.  Noting Dr. Carmody's

prior diagnosis of an "incomplete tear" and opinion that an "MRI may be of value,"

*id.* at 19, Plaintiff was to be scheduled for an off-site MRI and orthopedic

consultation, *id.* at 20.  A September 10, 2007, medical record entry confirms the

appointment and shows that Plaintiff was to be seen by "Dr. Regan" in

Albuquerque on October 25, 2007.  *Id.* at 21.

The medical record that reports Mr. Regan a doctor is a misleading, because

the medical report bearing the name "Kevin Regan" shows that he is a "PA" or

"physician's assistant" and that the orthopedist is Dr. Damon Sacoman.  *See id.* at

---

[9]  The response noted the x-ray appointment that had been scheduled for August 17,
2007. *Doc. 22-7* at 8. This triggered another round of grievances, because Plaintiff wanted to see
a specialist and disagreed that an x-ray would be of any value.  *Id.* at 8-12.  The ex-rays of his
right shoulder and "humerus" (the arm bone that runs from the elbow to shoulder) were both
negative. *See Doc. 22-3* at 17-18.

24; *see also Doc. 22-4* at 3; *Doc. 28* at 3-4.  Dr. Sacoman did not see Plaintiff at the

October 25th visit because the report from that visit was dictated by "KR/SF" and

refers to Dr. Sacoman in the third person.  *See Doc. 22-3* at 24.  The "objective"

section of Mr. Regan's report provides:

> In reviewing the reports from the prison, he had an
> ultrasound with evidence of scarring at the most
> proximate portion of the triceps muscle without evidence
> of increased blood flow consistent with probable previous
> incomplete tear of latissimus dorsi, is unremarkable.  MRI
> would be of value.  An ultrasound of the triceps muscle.
> *On exam, the triceps muscle appears to be intact with
> latissimus dorsi and the posterior axillary triangles is
> deficient compared to the other side and it feels like the
> latissimus dorsi has gone.*  He had x-rays of his shoulder
> and humerus, which were normal.  I do not have these
> tests to verify all of that information.

*Id.* (emphasis added).[10]  Although it could be that this entire section was the result

of Plaintiff's complaints and Mr. Regan's review of the prison medical records, I will

assume that the above highlighted text is what he personally observed about

Plaintiff's arm.[11]

---

[10]  The "axillary triangle" is "a triangular area embracing the medial aspect of the arm,
the axilla, and the pectoral region."  *Stedman's Online Medical Dictionary* (2009) (available at
www.stedmans.com).  In other words, it is the armpit and surrounding areas of the upper arm
and chest.  *See id.* (definitions of "medial," "axilla," and "pectoral"); *see also Doc. 22-4* at 4 ("right
posterior axilla (armpit)").

[11]  *See Doc. 22-4* at 3 (affidavit of Dr. Donald Lacy, describing medical records and
stating "Mr. Coulthrust was evaluated by Physician's Assistant Kevin Regan who performed an

Mr. Regan recommended that Plaintiff "have an MRI done primarily in the posterior wall of the axillary triangle to see if the absence of the latissimus dorsi is present" and noted that "[w]e will have him follow up with Dr. Sacoman after the MRI." *Id.* The MRI was never conducted, however.

Six days after the visit, Plaintiff was seen by Dr. Donald Lacy, who observed that "there is a 'cord'" in Plaintiff's right armpit "that is lightly tender to palpation." *Id.* at 25.[12] He did not schedule an MRI because he believed it to be "medically unnecessary and elective." *Doc. 22-4* at 4; *see also Doc. 22-3* at 25. His notes state: "NO MRI; can get wk up when released in [illegible] months, offered exercises for rotator cuffs but he thinks it will make it worse. Advised this is elective." *Doc. 22-3* at 25; *see also id.* at 28. Plaintiff's subsequent requests for the MRI to be

---

examination"); *see also, e.g., Doc. 22-3* at 15 (ultrasound finding that the "triceps and latissimus dorsi appear intact"); *id.* at 19 (Plaintiff complaining of "burning pain & *doesn't like how it looks when he raises his arm*" and observing that Plaintiff has "totally buffed triceps/biceps") (emphasis added); *Doc. 22-7* at 7 (Plaintiff grievance before the appointment with Mr. Regan that "even a novi[ce] physician can clearly see that one muscle is augmented and different than the other").

[12]  Though his medical notes do not reflect it, his affidavit states that he also observed that Plaintiff "had good motion and strength of the shoulder" and that he concluded Plaintiff "had no significant loss of function or strength." *Doc. 22-4* at 4. The medical notes state "muscular lucid NAD," "in [right] scilla there is a 'cord' that is slightly tender to palpation;" "ortho consult weak rotaters 10/[25]07;" "X-R above" and assessed a right "shoulder injury 8/2006." *Doc. 22-3* at 25. Contrary to Dr. Lacy's medical notes, the report of Mr. Regan's that was submitted here does not specifically mention weak rotator cuffs. It could be that his notes about Plaintiff's subjective complaints suggested that condition to Dr. Lacy. *See Doc. 22-3* at 24 ("he has a hard time throwing a ball, doing certain overhead activities, pushing and pulling and sometimes even with bench press. He can do pushups, but he cannot do lat pull downs.").

performed while he was incarcerated were denied.  *See id.* at 27-29.

## III.  Analysis

"It is well established that prison officials violate the Eighth Amendment if their 'deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain.' . . . 'This is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care.'" *Kikumura*, 461 F.3d at 1291 (quoting *Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976)); *see also Mata*, 427 F.3d at 753 (same).  A "medical need is sufficiently serious if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention."  *Mata*, 427 F.3d at 751 (internal quotations and citation omitted); *see also Kikumura*, 461 F.3d at 1292 (same).

Dr. Lacy's diagnosis and another affidavit submitted by Defendants suggest that Plaintiff's injury was not "severe."  *See 22-6* at 1-4.  Other submissions suggest that Plaintiff performed heavy manual labor and "worked out" and thus was not injured or in pain to the extent he alleges.  *See Doc. 22-6.*  Plaintiff takes issue with these suggestions and counters with descriptions of his abilities.  *See Doc. 27.*  I

13

need not resolve that factual dispute, however.   I will assume for the purposes of

argument that Plaintiff suffered a torn muscle and it qualifies as a "serious medical

need."

Nevertheless, "'[m]edical malpractice does not become a constitutional

violation merely because the victim is a prisoner'' and a "complaint about 'an

inadvertent failure to provide adequate medical care' or 'that a physician has

been negligent in diagnosing or treating a medical condition does not state a valid

claim of medical mistreatment under the Eighth Amendment.'"  *Kikumura,* 461

F.3d at 1291 (quoting *Estelle,* 429 U.S. 97, at 105-06); *see also Mata,* 427 F.3d at

751 (same).  Likewise, a prisoner's disagreement with the course of treatment

prescribed and given by medical staff does not arise to a claim of Constitutional

dimension.  *E.g., Fitzgerald v. Corr. Corp. of Am.,* 403 F.3d 1134, 1142 (10th Cir.

2005); *Perkins v. Kan. Dep't of Corr.,* 165 F.3d 803, 811 (10th Cir. 1999).

This case is not like those cases where allegations of delay or medical care

were sufficient to support an Eighth Amendment violation.  For example, in *Mata*

there was a delay in response to heart attack symptoms and in *Kikumura* where the

symptoms were inability to stand, vomiting, and seizures.  In *Oxendine v. Kaplan,* a

prison doctor and prison medical assistant surgically reattached an inmate's severed

finger at the prison, but when the tissue of the reattached finger began to turn

14

black and gangrenous, waited for up to a week to seek the assistance of a
specialist.[13]  In *Garrett v. Stratman,* treatment for a shoulder injury sustained in a
fight was delayed for months after the fight, then diagnosed as requiring surgery,
and then surgery was delayed an additional eleven months.[14]

    Instead, here the material facts are not in dispute and, at most, this suit
involves a difference of opinion about treatment.  On the occasions when Plaintiff
sought medical treatment for his injured arm or complaints of pain, he received
prompt medical attention and medication to help control the pain.  As his
condition did not appear to be responding, prison officials engaged in a series of
tests to determine the cause of the pain.[15]  Furthermore, not one health care

---

    [13]   *See* 241 F.3d 1272, 1274 (10th Cir. 2001) ("In his complaint, Oxendine alleged that
Defendants Dr. Barry Kaplan, M.D., the prison physician, and Jose Negron, an assistant to Dr.
Kaplan, were not qualified to perform an emergency re-attachment of Oxendine's right,
middle-finger fingertip after it was accidentally severed when it was caught in Oxendine's cell
door.  Despite their lack of qualification, alleged Oxendine, Defendants refused to obtain outside
specialized medical assistance both before performing the surgery and after Oxendine's injury
exhibited signs of significant worsening in the weeks following the surgery.").

    [14]   *See* 254 F.3d 946, 947 (10th Cir. 2001) ("Garrett's shoulder was injured during a prison
yard fight on June 14, 1995.  According to the complaint, his condition was ignored until August
25, 1995, when the shoulder injury was diagnosed by Dr. Jere Sutton, an orthopedic consultant.
Although Dr. Sutton recommended reconstructive surgery, appellant was not transferred to the
United States Medical Center for Federal Prisoners in Springfield, Missouri, for consultation with
an orthopedic surgeon until May 1996, eleven months after the injury.").

    [15]   *See, e.g., Olson v. Stotts,* 9 F.3d 1475, 1477 (10th Cir. 1993) ("With regard to plaintiff's
enlarged claim that he was made to suffer for eighteen months while the prison failed to provide
him with a heart specialist and surgery, we again look solely to the medical records that plaintiff
submits in support of his claim of deliberate indifference.  Rather than support a claim of

provider who saw Plaintiff over the course of a year was of the opinion that surgery was necessary, much less immediately so.[16]  The Tenth Circuit has held that a plaintiff who "differs with the medical judgment of the prison doctor, believing that he should have received his elective surgery sooner than he did . . . does not support a claim of cruel and unusual punishment [under the Eighth Amendment for denial of medical care]."  *Olson,* 9 F.3d at 1477.

Finally, to prevail on the "subjective" portion of the Eighth Amendment test, Plaintiff "must establish that defendant(s) knew he faced a *substantial risk of harm* and disregarded that risk, by failing to take reasonable measures to abate it." *Kikumura,* 461 F.3d at 1293 (internal quotations and citations omitted) (emphasis added).  Nothing in the allegations or *Martinez* Report points to a life-threatening situations, exacerbation of existing medical conditions, lifelong handicap or a permanent loss.  *See Hunt v. Uphoff,* 199 F.3d 1220, 1224 (10th Cir. 1999).

Wherefore,

IT IS HEREBY RECOMMENDED that this action be dismissed with

---

deliberate indifference, the attachments show appropriate medical treatments prior to hospitalization.").

[16]  *See Holt v. Werholtz,* 185 Fed. App'x 737, 740-741 (10th Cir. 2006) ("According to his own allegations, Holt was prescribed medication for his shoulder pain.  Therefore, prison officials did not disregard Holt's condition.  His assertion that corrective surgery is required is conclusory. Without any medical opinion evidence, Holt's personal desire for surgery is insufficient.").

prejudice.

IT IS FURTHER ORDERED that, consistent with Footnote 1, Defendants properly authenticate the medical records within the time for objections.

IT IS FINALLY ORDERED that the Clerk substitute as the cause code "28:1331b – 28:1331 Federal Question: Bivens Act," for "42:1983 Prisoner Civil Rights."

THE PARTIES ARE FURTHER NOTIFIED THAT WITHIN 10 DAYS OF SERVICE of a copy of these Proposed Findings and Recommended Disposition they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1).  A party must file any objections with the Clerk of the District Court within the ten-day period if that party wants to have appellate review of the proposed findings and recommended disposition.  If no objections are filed, no appellate review will be allowed.

UNITED STATES MAGISTRATE JUDGE